# EXHIBIT E

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF BRONX**
------------------------------------------------------------------X

ALTHEA BEAZER,                                          Index No.: 810512/2022E

                          Plaintiff,                    **COMPLAINT**

           -against-                                    Jury Trial Demanded

REBEKAH REHAB & EXTENDED CARE CENTER,
KENNETH GELB, CONNIE CAPALDO, and
IVAN RAMKHELAWAN-SIN,

                          Defendants.
------------------------------------------------------------------X

Plaintiff ALTHEA BEAZER ("Plaintiff"), by her attorneys, Goddard Law PLLC, whose

offices are located at 39 Broadway, Suite 1540, New York, New York 10006, as and for her

Complaint, alleges, upon knowledge with respect to herself, and upon knowledge, information

and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1.      In 2019, Plaintiff was sexually assaulted at work by her co-worker, Defendant

Ivan Ramkhelawan-Sin ("Defendant Building Services Sin"). Defendant Rebekah Rehab &

Extended Care Center ("Defendant Rebekah Rehab"), did nothing to protect Plaintiff from

further assault by Defendant Building Services Sin until Plaintiff made a police report. After that,

Plaintiff learned that approximately 20 other female employees previously reported Defendant

Building Services Sin had brushed up against them inappropriately or touched them

inappropriately.

2.      Defendant Rebekah Rehab serves a vulnerable population of patients, many of

whom have difficulty moving, much less defending themselves against physical assault.

Nevertheless, Defendant Rebekah Rehab permitted a sexual predator to continue working for

them, sweeping Defendant Business Services Sin's previous actions under the rug, and

attempting to do the same with Plaintiff's sexual assault. Apparently, Defendant Rebekah Rehab

considered its reputation and financial status to be more important than the safety of its

vulnerable population and employees.

      3.      As if sexual assault were not bad enough, over the 10 years Plaintiff operated

Defendant Rebekah Rehab's on-site patient salon, she was subjected to blatant race and gender

discrimination and a hostile work environment, as Defendant Rebekah Rehab refused to provide

Plaintiff with the same help it provided its previous, white cosmetologist.

      4.      Plaintiff brings this action to remedy claims of race discrimination, gender

discrimination, unequal pay, and retaliation in violation of New York City Human Rights Law,

New York State Human Rights Law, New York Labor Law, and the 1866 Civil Rights Act.

      5.      Plaintiff seeks declaratory relief, monetary, and punitive damages.

## JURISDICTION AND VENUE

      6.      Jurisdiction of the Court over this controversy is based upon C.P.L.R. §§ 301 and

302, because Defendants are located in New York, and/or are transacting business in Bronx,

New York, and because the majority of events happened in Bronx, New York.

## PARTIES

      7.      Plaintiff Althea Beazer ("Plaintiff") is a Black female citizen of the United States,

who resides in Bronx, New York. Plaintiff was subjected to race discrimination, gender

discrimination, unequal pay, and retaliation, which ultimately resulted in her constructive

termination from Defendant Rebekah Rehab.

8.      Defendant Rebekah Rehab is a health care facility organized and existing under the laws of the State of New York, and authorized to do business in the state of New York. At all relevant times, Defendant Rebekah Rehab was an "employer" under all relevant statutes.

9.      At all relevant times, Plaintiff was an "employee" of Defendant Rebekah Rehab within the meaning of all relevant statutes.

10.     Defendant Connie Capaldo ("Defendant Director Capaldo"), a white female was, at all relevant times, the Director of Human Resources for Defendant Rebekah Rehab. In that capacity, Defendant Director Capaldo was Plaintiff's direct supervisor and controlled the terms and conditions of Plaintiff's employment. Defendant Director Capaldo was Plaintiff's "employer" under all relevant laws.

11.     Defendant Kenneth Gelb ("Defendant CEO Gelb"), a white male was at all relevant times, the Chief Executive Officer at Defendant Rebekah Rehab. In that capacity, Defendant CEO Gelb was Plaintiff's direct supervisor and controlled Plaintiff's terms and conditions of employment. CEO Gelb was Plaintiff's "employer" under all relevant laws.

12.     Defendant Building Services Sin was, at all relevant times, a Building Services employee at Defendant Rebekah Rehab.

## FACTUAL ALLEGATIONS

### Plaintiff Is A Competent and Experienced Cosmetologist
### Working in Residential Healthcare Facilities

13.     In the mid-2000s, Plaintiff began working with Classic Hair Care, an agency that places cosmetologists in temporary employment positions. Classic Hair Care placed Plaintiff at Providence Rest, a nursing home and rehabilitation facility, at which plaintiff was in charge of running the on-site salon and providing cosmetology services to residents.

3

14.     Providence Rest always provided Plaintiff with the necessary supplies and salon equipment to ensure she was able to perform her job duties efficiently. Further, Providence Rest provided plaintiff with "transporters;" i.e., Province Rest employees and volunteers who help residents get to the salon if they were unable to get there on their own. During her employment with Providence Rest, Plaintiff was never required to transport patients to and from the salon.

15.     Impressed by Plaintiff's work ethic and abilities, Classic Hair Care quickly promoted Plaintiff and transferred her to a larger nursing home facility, Jewish Home Life Care ("Jewish Home"). Plaintiff was not only expected to provide cosmetology services to residents, but oversaw operation of all three of Jewish Home's salons. Just like at Providence Rest, Jewish Home provided plaintiff with equipment, supplies, and facility employees to transport patients to and from the salon. Plaintiff was never required to transport patients to and from the salon at Jewish Home.

16.     Plaintiff regularly received compliments and praise from patients, their families, and Jewish Home employees for her compassion and ability to operate the salon smoothly, on her own. Plaintiff was also recognized for her ability to perform a wide range of services on many different types of hair.

17.     Upon information and belief, it was a standard industry practice for nursing homes and rehab facilities provide cosmetologists with salon equipment, supplies, and client transportation. In addition to working with Classic Hair Care, Plaintiff worked directly for Laconia Nursing Home in Bronx, New York, which also provided salon equipment, supplies, and client transportation for its cosmetologists.

4

**Defendant Director Capaldo Actively Pursues Plaintiff To**
**Fill Defendant Rebekah Rehab's Cosmetology Position**

18.     Defendant Rebekah Rehab provides short- and long-term in-patient rehabilitative

health services and care to patients across the New York metropolitan area. It is located in

Bronx, New York.

19.     In or about July 2011, Defendant Rebekah Rehab's Human Resources Director,

Defendant Director Capaldo, contacted Plaintiff to recruit her for the position of cosmetologist at

Defendant Rebekah Rehab. Director Capaldo knew of Plaintiff's stellar reputation for providing

services to the residential care population and actively sought to bring her on board. Director

Capaldo told Plaintiff that Defendant Rebekah Rehab's previous long-term cosmetologist was no

longer at the center and they were looking for a replacement.

20.     As Defendant Director Capaldo described the position, Plaintiff was to be in

charge of providing salon services to Defendant Rebekah Rehab's residents and running the

salon, which was located on the first floor of the center. Similar to her previous nursing home

cosmetologist positions, Plaintiff would be paid based upon the salon services she provided to

patients. Plaintiff would set her own rates for the services. Plaintiff would not receive additional

pay from Defendant Rebekah Rehab because she was not tasked with duties beyond providing

cosmetology services and running the salon. Specifically, she was not expected to provide care

or transportation for her clients.

21.     Defendant Director Capaldo assured Plaintiff that Defendant Rebekah Rehab

would provide transportation for patients who required assistance getting to and from their rooms

to the salon. This was critical because all patient rooms were upstairs from the salon. Without

this assurance, Plaintiff would not have accepted the position at Defendant Rebekah Rehab. First,

she was not trained in patient care or the safety considerations of transporting clients. Second,

5

since Plaintiff was only paid for the cosmetology services she rendered, spending time transporting clients, or limiting the client base to fully self-ambulatory clients, did not make financial sense to her. She would earn substantially less money working for Defendant Rebekah Rehab without transport services than continuing to work at Jewish Home.

22.     It never occurred to Plaintiff to ask whether Defendant Rebekah Rehab would provide salon supplies or fund the purchase of updated salon equipment. It is a standard within the beauty industry that the nursing home salon provides these things to cosmetologists. Plus, defendant Rebekah Rehab paid for the work supplies and equipment used by all other employees.

23.     Plaintiff, who was happily and successfully managing the salons at Jewish Home, ultimately decided she preferred the idea of a long-term position and being employed directly by a nursing home rather than an agency. Thus, she accepted the position at Defendant Rebekah Rehab.

**Plaintiff Begins Working at Defendant Rebekah Rehab
and is Immediately Thrust Into a Hostile Work
Environment, Led By Activities Director Annunziato**

24.     Since Defendant Rebekah Rehab considered cosmetology services a resident "activity," Defendant Director Capaldo informed Plaintiff that she would be part of the Activities Department. Activities Director John Annunziato ("Activities Director Annunziato"), a white male, managed the Activities Department. He was in charge of assigning transporters – Activities Department employees and volunteers – to the salon each day.

25.     Plaintiff was excited to begin what she hoped would be a long working relationship with the Activities Department of Defendant Rebekah Rehab. She soon realized she was the only Black employee in charge of a department.

6

26.     Eager to make a good impression, Plaintiff made a point to greet the nurses and her fellow employees as she made her way to the salon each morning. Plaintiff noticed that whenever she passed by the Activities Room and greeted Activities Director Annunziato, he bristled, becoming visibly annoyed and bothered by Plaintiff's presence. He had no interest in getting to know her or engaging her in conversation.

### Plaintiff's Business and Income Declines Because Activities Director Annunziato Refuses to Provide Transporters for the Salon

27.     For the first month, Plaintiff had a full schedule of client appointments. She was not able to see every patient who wanted cosmetology services. Over the course of the month, Plaintiff noticed that all the residents she saw were able to walk from their rooms to the salon without assistance from a transporter. Plaintiff assumed that Activities Director Annunziato, who was in charge of providing transportation to and from the salon, was waiting to assign transporters because the salon was already fully booked with residents who could get themselves to the salon.

28.     In or about July 2011, the demand for cosmetology services among self-ambulatory residents began to decline. Plaintiff began to notice that even when the salon was not fully booked, Activities Director Annunziato did not provide transportation services for the salon. Would-be clients who needed transport to the salon missed their appointments. As result, Plaintiff only had a handful client each day, and would sometimes work entire day without a single client. Plaintiff received no pay at all for the day she worked but did not see clients.

29.     Plaintiff wondered if Activities Director Annunziato had forgotten about the need for transport services for the salon, and decided to inquire. Thus, when Plaintiff passed the Activities Room and greeted Activities Director Annunziato, she started asking if he had available transporters for the salon that day. Activities Director Annunziato often responded with

7

a displeased facial expression or by coldly responding, "No," without even saying hello to Plaintiff. Plaintiff felt unwanted and unwelcome by Activities Director Annunziato and believed that he was unapproachable. She was also embarrassed by his dismissive and disrespectful behavior toward her, which was often observed by residents, Activities Department employees, and volunteers at Defendant Rebekah Rehab.

30.    Upon information and belief, Activities Director Annunziato disliked Plaintiff due to her race and gender.

31.    Upon information and belief, Activities Director Annunziato refused to provide the salon with the transport services necessary for Plaintiff to perform her job and get paid for her work due to her race and gender.

**Activities Department Employees Adopt**
**Activities Director Annunziato's Belittling Behavior toward Plaintiff**

32.    Plaintiff began to notice the other white employees in the Activities Department started adopting Activities Director Annunziato's belittling and dismissive behavior towards her. These other Activities Department employees acted as if Plaintiff was not as valuable as white employees in the Activities Department because they saw how Activities Director Annunziato treated her. For example, when Plaintiff asked Activities Department employees who transported residents to the Activities Room if they would transport residents to the salon, they often dismissed Plaintiff or told her they were busy. These employees were not working; they were standing around chatting with other employees. Upon information and belief, Activities Director Annunziato told Activities Department employees not to help Plaintiff.

33.    Upon information and belief, the Activities Department employees at Defendant Rebekah Rehab openly refused to help transport salon clients due to Plaintiff's race and gender.

NYSCEF DOC. NO. 9
RECEIVED NYSCEF: 01/06/2023

34.     Upon information and belief, Activities Department employees excluded and dismissed Plaintiff due to her race and gender after observing the way Activities Director Annunziato mistreated Plaintiff and adopting his manner.

35.     Upon information and belief, Activities Director Annunziato did not make a regular practice of being dismissive or rude to white, male employees in the Activities Department.

### Plaintiff Complains to Defendant Director Capaldo, Who Fails to Investigate Activities Director Annunziato's Behavior

36.     After months of being refused help by Activities Director Annunziato and the Activities Department's white employees, Plaintiff complained to Defendant Director Capaldo. She stated that Activities Director Annunziato refused to transport clients to the salon as she had been promised, and explained that she was unable to service the non-ambulatory population at Defendant Rebekah Rehab. This necessarily meant she was unable to earn the wages she expected from servicing them.

37.     Non-ambulatory patients with salon appointments were not serviced during this period. When the residents or their families complained, Defendant Rebekah Rehab blamed Plaintiff even though the appointments were missed due to Defendant Rebekah Rehab's failure to provide transportation to and from the salon. This further interfered with Plaintiff's ability to earn wages by hurting her reputation with the families and residents.

38.     Defendant Director Capaldo ostensibly discussed the salon transportation issue with Activities Director Annunziato, who reportedly stated that he had insufficient staff to assign someone to the salon. Despite her promise of client transportation while recruiting Plaintiff, Defendant Director Capaldo informed Plaintiff there was nothing Defendant Rebekah Rehab could to the ameliorate the salon transport problem.

9

Case 1:23-cv-00967-KMW     Document 1-5     Filed 02/06/23     Page 11 of 33

39.     Plaintiff was surprised to learn that Activities Director Annunziato lacked sufficient staff to transport salon clients because she often witnessed the transporters standing around and chatting, without assigned tasks. Nevertheless, Plaintiff believed Defendant Director Capaldo investigated her complaints thoroughly and in good faith, and confirmed for herself that the Activities Department was understaffed.

40.     Without any solution from Defendant Director Capaldo, Plaintiff continued to manage the salon, serving few – and sometimes no – clients each day, and earning far less income than she was promised she would earn.

41.     Upon information and belief, Defendant Director Capaldo did not investigate Plaintiff's complaints thoroughly or in good faith, and did not ascertain for herself whether the Activities Department was truly short-staffed.

**Plaintiff Is Forced To Perform Unpaid Work At
Defendant Rebekah Rehab To Try To Make Ends Meet**

42.     With so few self-ambulatory clients, and earning far less than Defendant Director Capaldo led her to believe she would earn, Plaintiff worried she would struggle to make ends meet. Her worries were well-placed. Despite the hours she spent at Defendant Rebekah Rehab, Plaintiff was forced to apply for public assistance twice while she worked there. Defendant Director Capaldo was well-aware of this fact: she wrote letters in support of Plaintiff's applications for public assistance each time.

43.     Plaintiff was forced by economic realities to perform unpaid work for Defendant Rebekah Rehab. Plaintiff took on the role of transporting salon clients – a role ordinarily filled by a paid employee or volunteer – to transport patients to and from their rooms just so she would have clients to serve at the salon. For clients who could be moved via wheelchair, Plaintiff assisted the patient to the wheelchair and wheeled the patient to the salon. If the patient was

10

Case 1:23-cv-00967-KMW    Document 1-5    Filed 02/06/23    Page 12 of 33

bedridden, Plaintiff was forced to push the patient's large hospital bed through the halls, to the

elevators, and down to the salon.

44.     Plaintiff lacked training on proper methods to move patients and maneuver

hospital beds and, consequently, suffered a rotator cuff injury requiring physical therapy and

surgery.

45.     Plaintiff was never compensated for this work, which would otherwise have been

performed by a paid employee of Defendant Rebekah Rehab or a willing volunteer. Plaintiff

never agreed to volunteer her services to Defendant Rebekah Rehab.

46.     Defendant Director Capaldo knew that Plaintiff was performing work for

Defendant Rebekah Rehab that would ordinarily be performed by a paid employee or willing

volunteer. Her response was to ignore wage payment laws and declare that Defendant Rebekah

Rehab could do nothing to fix the situation.

**Defendant Rebekah Rehab's Chief Executive Officer and Defendant
Director Capaldo Willfully Ignore Wage Payment Laws**

47.     Defendant Rebekah Rehab's Chief Executive Officer Kenneth Gelb ("Defendant

CEO Gelb") knew that Plaintiff was performing work ordinarily assigned to a paid employee or

willing volunteer, without pay. Plaintiff spoke with Defendant CEO Gelb on several occasions

about the lack of transport services for the salon.

48.     Defendant CEO Gelb did not arrange for Plaintiff to be paid for the unpaid, forced

"volunteer" work she performed. Rather, he stated that if she wished to be paid for all the hours

she worked, she would have to split what she receives from performing salon services with

Defendant Rebekah Rehab, thereby earning even less money. He, also, considered it appropriate

to ignore wage payment laws.

11

49.     Upon information and belief, Defendant Rebekah Rehab, Defendant CEO Gelb, and Defendant Director Capaldo did not force white employees to perform unpaid or forced "volunteer" work.

50.     Upon information and belief, Defendant Rebekah Rehab, Defendant CEO Gelb, and Defendant Director Capaldo did not expect white employees to perform work outside the scopes of their jobs in the ordinary course, just so they could perform their own jobs.

**Concerned Coworkers Inform Plaintiff That White Cosmetologists Are Provided Transporters And Not Forced To Perform Unpaid Work At Defendant Rebekah Rehab**

51.     In or about 2012, a Black, female nurse ("Nurse Jane Doe") stopped Plaintiff while she was on her way to a resident's room to transport them to the salon. Nurse Jane Doe, who observed that Plaintiff was forced to perform unpaid transport work, told Plaintiff that Defendant Rebekah Rehab's previous, white cosmetology, Sue Argiento ("Cosmetologist Argiento"), did not have to transport patients herself because the salon had an assigned transporter, just like Plaintiff was promised. Nurse Jane Doe highlighted that Cosmetologist Argiento was a white woman.

52.     Plaintiff was also approached by a Food Services employee named Joann. Joann shared her surprise that Defendant Rebekah Rehab forced Plaintiff to transport patients because the previous, white cosmetologist did not have that responsibility. Joann stated that she never saw the previous, white cosmetologist transport a resident to and from the salon.

53.     Upon information and belief, both Nurse Jane Doe and Joann believed that Defendant Rebekah Rehab treated Black cosmetologists more poorly than it treated white cosmetologists, forcing the Black cosmetologist to transport clients to and from the salon when the white cosmetologist had dedicated transporters to do that work.

54.     Upon information and belief, Activities Director Annunziato provided the previous, white cosmetologist with transport services for clients.

55.     Upon information and belief, Activities Director Annunziato did not exclude or belittle the previous, white cosmetologist.

56.     Upon information and belief, Activities Director John claimed the Activities Department was understaffed so he would not have to provide a Black employee the same transportation services he provided to a white employee.

**Defendant Director Capaldo Continues to Ignore Plaintiff's Complaints**

57.     Throughout 2012 and 2013, Plaintiff regularly called and visited the office of Defendant Director Capaldo to complain that Activities Director Annunziato was not assigning transporters to the salon, forcing Plaintiff to perform unpaid, forced "volunteer" work that was outside the scope of her job.

58.     When she called Defendant Director Capaldo's office to complain, Plaintiff's calls were often ignored or sent to voicemail, even when Defendant Director Capaldo was in her office, near the phone. Upon information and belief, Defendant Director Capaldo refused Plaintiff's calls to avoid addressing Plaintiff's concerns about Defendant Rebecca Rehab's inequitable, discriminatory employment practices.

59.     On the occasions when Plaintiff was able to meet with Defendant Director Capaldo face-to-face, Defendant Director Capaldo would just repeat Activities Director Annunziato's claim that the Activities Department had insufficient employees or volunteers to provide transport to the salon. Nevertheless, Plaintiff frequently observed Activities Department employees and volunteers standing around without assignments. The transporters were only ever asked to bring residents to and from the Activities Room, never the salon.

### Activities Director John Humiliates And Harasses Plaintiff In The Elevator

60.     In or about 2012, Plaintiff entered Defendant Rebecca Rehab's elevator to pick up a patient to bring to the salon. At the same time, Activities Director Annunziato also entered the elevator. After a few moments of silence, Activities Director Annunziato looked Plaintiff up and down in a lascivious manner, performing a blatant and disturbing visual inspection of Plaintiff's body. Then he asked, "Why don't you just eat a burger already?" Upon information and belief, Activities Director Annunziato was implying that Plaintiff ought to appear physically attractive to him and that her purpose at Defendant Rebecca Rehab was ornamental.

61.     Plaintiff was mortified by Activities Director Annunziato's objectification of her. She could not fathom how or why her co-worker would think that comments about her body would ever be appropriate for the workplace, especially in such a demeaning and sexualizing manner. This episode confirmed what Plaintiff suspected: Activities Director Annunziato did not like or respect her as a person.

62.     Upon information and belief, Activities Director Annunziato disliked Plaintiff because of her race and gender.

63.     Upon information and belief, Activities Director Annunziato did not demean, objectified, and harassed white employees at Defendant Rebecca Rehab.

64.     Upon information and belief, Activities Director Annunziato did not demean, objectify, and harass male employees at Defendant Rebecca Rehab.

### Activities Director John Goes On Leave And Is Replaced By Activities Director Hera

65.     In or about 2013, Activities Director John was involved in an accident and did not return to Defendant Rebekah Rehab until around 2019. He was replaced by Vinod Hera ("Director Hera"), who became the new Director of Activities at Defendant Rebekah Rehab.

14

66.     Plaintiff was optimistic that a new activities director would provide the salon with the promised transportation services, and that she would no longer be subjected to race discrimination and sexual harassment at Defendant Rebekah Rehab. Director Hera, unfortunately, took his cues from the Activities Department staff, which learned its culpable behavior from Activities Director Annunziato.

67.     Plaintiff, therefore, continued to be subjected to belittling, demeaning, and objectifying behavior at Defendant Rebekah Rehab, and continued being forced to perform unpaid, forced "volunteer" work transporting clients to and from the salon.

### HR Assistant Catherine Cieri Belittles and Objectifies Plaintiff

68.     In addition to Activities Director Annunziato, one member of the Activities Department was especially problematic in her treatment of Plaintiff. This person, Catherine Cieri ("HR Assistant Cieri"), was eventually hired to be Defendant Director Capaldo's assistant, where she insulted, demeaned, and objectified Plaintiff with impunity.

69.     On one notable occasion, HR Assistant Cieri offered her old clothes to Plaintiff, suggesting that Plaintiff could not afford to buy her own clothes. Plaintiff was completely humiliated and demeaned HR Assistant Cieri's assumption that Plaintiff could not afford to buy her own clothes. Upon information and belief, HR Assistant Cieri did not offer her old clothes to white employees.

70.     In or about 2018, HR Assistant Cieri unexpectedly approached Plaintiff while she was cutting a patient's hair, put her hands on Plaintiff's face, and stroked her skin while saying, "You are so beautiful." HR Assistant Cieri seemed to be fascinated by Plaintiff's skin color and texture, and oblivious to normal personal boundaries in the workplace. She treated Plaintiff as if

15

she were a thing to be admired, a cat to be petted, and not a person. Upon information and belief, HR Assistant Cieri never touched white employee's faces or objectified them in such a manner.

71.     This display of over-familiarity and act of dominion over Plaintiff's physical person was made all the more humiliating by the fact that a patient was present. Plaintiff felt humiliated and violated as HR Assistant Cieri petted her face while she tried to serve her client.

72.     Upon information and belief, HR Assistant Cieri was fascinated by Plaintiff's skin because of Plaintiff's race. Moreover, HR Assistant Cieri felt empowered to impose on Plaintiff's person because of Plaintiff's race.

### HR Assistant Cieri Concocts a Story to Get Plaintiff Banned from Defendant Rebekah Rehab's Finance Department

73.     Every week since her employment with Defendant Rebekah Rehab began in 2011, Plaintiff delivered her weekly invoices to Finance Coordinator Pagan's office. If Finance Coordinator Pagan was not in her office, Plaintiff had her permission to leave the invoice on her desk.

74.     This practice proceeded without interruption or note until an occasion when HR Assistant Cieri peered into Finance Coordinator Pagan's office and watched Plaintiff as she placed the invoices on the desk and left the office. HR Assistant Cieri reported to Defendant Director Capaldo that Plaintiff was searching through Finance Coordinator Pagan's desk to steal money.

75.     That same day, Defendant Director Capaldo called Plaintiff into her office, informed her of HR Assistant Cieri's claims, and formally banned Plaintiff from entering Finance Coordinator Pagan's office altogether, regardless of whether Finance Coordinator Pagan was present. Defendant Director Capaldo dismissed Plaintiff's explanation that she was merely

16

dropping off invoices as she had done every week. Instead, Defendant Director Capaldo believed her white employee without performing an investigation of any kind.

76.     With Defendant Director Capaldo's prohibition in place, Plaintiff was forced to stand outside the finance office each week to deliver her invoices. Plaintiff had to knock on the office door until Finance Coordinator Pagan came to the door to accept the invoices.

77.     Plaintiff felt completely dehumanized, embarrassed, and humiliated by the episode. Plaintiff believed rather strongly that HR Assistant Cieri and Defendant Director Capaldo viewed her as untrustworthy because of her race.

78.     Upon information and belief, HR Assistant Cieri did not make reports about white employees who were alone in Finance Coordinator Pagan's office for attempting to steal.

79.     Upon information and belief, Defendant Director Capaldo did not ban white employees from the financial office without performing an investigation.

**Plaintiff Requests A Meeting With CEO Gelb To Complain and
Director Hera Spitefully Provides Marginally Helpful Volunteer Transporters**

80.     After Defendant Director Capaldo continually failed to address Plaintiff's complaints, Plaintiff requested a meeting with Defendant CEO Gelb in 2013. She met with Defendant CEO Gelb and Defendant Director Capaldo together, and complained that she was not being provided the promised transporters or pay for additional work she performed.

81.     CEO Gelb responded by arranging a meeting among Plaintiff, Director Hera, and Defendant Director Capaldo, during which they were to ensure that Plaintiff was provided transporters.

82.     Following the meeting with Plaintiff and Defendant Director Capaldo, and notwithstanding CEO Gelb's directive, Director Hera only occasionally assigned transporters to the salon. When he did, they were volunteer students from Wide Eye, a school for people with

17

disabilities. Wide Eye students only volunteered 1-2 days per week and many students required close supervision, assistance, and accommodations.

83.     Upon information and belief, Director Hera did not want to provide transporters and did not want to supervise or assist volunteers with disabilities. Therefore, Director Hera always assigned the Wide Eye volunteers to Plaintiff.

84.     On the days when Wide Eye students were unavailable, Director Hera did not assign alternate transporters to the salon. Instead, Director Hera curtly informed Plaintiff that he had already assigned "his" volunteers and employees for the day, implying that Plaintiff was not part of the Activities Department.

85.     By only assigning disabled volunteers to the salon, Director Hera replaced one unfair situation for another. For 1 or 2 days per week, Plaintiff had help with transport. She was not, however, able to see additional clients on those days because her unpaid, forced "volunteer" transport work was replaced with unpaid, forced "volunteer" supervisory work over the Wide Eye volunteers. The time she committed to transportation issues remained largely unchanged.

**Plaintiff Is Sexually Assaulted By a Defendant Rebekah
Rehab Employee and Defendant Rebekah Rehab Fails
to Investigate Until Plaintiff Reports the Assault to the Police**

86.     On or about July 10, 2019, Plaintiff noticed that the sink in Defendant Rebekah Rehab's salon was clogged and would no longer drain. She asked Defendant Building Services Sin to fix the drain.

87.     Defendant Building Services Sin entered the salon and began attempting to fix the sink while Plaintiff packed up her things to leave for the end of the day.

88.     Defendant Building Services Sin called Plaintiff over several times to "show her the issue," and let her know what the problem was with the sink. The final time Defendant

Building Services Sin called Plaintiff over so he could "show her something," he grabbed her and pushed her up against the counter. Defendant Building Services Sin pinned his body against Plaintiff's body so she could not move, and forcefully leaned in to kiss her on the lips. When Plaintiff resisted and pulled back in disgust, Defendant Building Services Sin aggressively grabbed and squeezed Plaintiff's genitals with his hand as he continued to attempt to kiss Plaintiff, saying, "Oh my god, you make me so excited. You feel so good. Are you into oral sex?"

89.     In a desperate attempt to get away from Defendant Building Services Sin, Plaintiff loudly shrieked, "Get off of me!" as she tried to pushed him away. After a few moments, Plaintiff finally broke free and sprinted away to put her desk between herself and Defendant Building Services Sin. When she turned back to make sure he had not chased after her, Plaintiff heard Defendant Building Services Sin continuing to make repulsive comments about engaging in sex acts.

90.     Plaintiff was shaking as she quickly gathered her things and ran out of the Defendant Rebekah Rehab workplace.

91.     When Plaintiff arrived at home, she immediately called Defendant Rebekah Rehab's Head of Security Lakeya and reported the assault. Plaintiff sobbed as she further shared that she had no intention of returning to Defendant Rebekah Rehab. Head of Security Lakeya instructed Plaintiff to come in the next day so she could write out a formal report of the assault. Plaintiff agreed, and on July 11, 2019, she went to Defendant Rebekah Rehab's security office to speak with Head of Security Lakeya and make a formal report. Head of Security Lakeya reported the assault to Defendant Rebekah Rehab's Human Resources Office and Defendant Building Services Sin's manager.

19

INDEX NO. 810512/2022E
RECEIVED NYSCEF: 01/06/2023

Case 1:23-cv-00967-KMW    Document 1-5    Filed 02/06/23    Page 21 of 33

92.      After report the assault to Defendant Rebekah Rehab, Plaintiff entered the salon

and sat at her desk. A few minutes later, Plaintiff looked up and, to her horror, found Defendant

Building Services Sin in the salon standing a few feet away from her. Plaintiff, fearing for her

safety, immediately began screaming at Defendant Building Services Sin to get out until he left

the salon.

93.      Plaintiff could not believe that after she reported the assault to Head of Security

Lakeya the night before, Defendant Rebekah Rehab made no effort to ensure her safety from

Building Services Sin. They did not tell him to stay home while they investigated. They did not

tell him to stay away from Plaintiff. Building Services Sin had already violently assaulted her,

and Plaintiff feared what he was capable of doing.

94.      Because Defendant Rebekah Rehab was apparently unconcerned about her safety,

Plaintiff decided to report the assault to the police. On or about July 12, 2019, Plaintiff called the

local police department and reported the assault that occurred on July 10, 2019.

95.      Only after the police began investigating the sexual assault did Defendant

Rebekah Rehab decide to take action and perform an investigation of Defendant Building

Services Sin.

**Defendant Rebekah Rehab Ignored About 20 Previous
Complaints of Sexual Assault Against Building Services Sin**

96.      As the investigation progressed, Plaintiff learned that over the previous few years,

approximately 20 female employees at Defendant Rebekah Rehab reported being brushed up

against or touched inappropriately by Defendant Building Services Sin. Each and every time,

Defendant Rebekah Rehab failed to take meaningful action and continued to allow Defendant

Building Services Sin to work.

20

97.    Indeed, Defendant Building Services Sin's reputation for sexual assault at Defendant Rebekah Rehab was so well known that Plaintiff's coworkers expressed "shock" that Plaintiff remained ignorant after working for so many years at Defendant Rebekah Rehab. Due to Defendant Rebekah Rehab's repeated inaction, female employees had to protect themselves by staying away from, and watching out for, Defendant Building Services Sin.

98.    On or about February 6, 2020, Defendant Building Services Sin plead guilty to Penal Law § 240.20, disorderly conduct.

**Defendant Director Capaldo Discourages Plaintiff From Pursuing
Her Criminal Complaint With Implicit Threats of Further Trauma**

99.    Following the assault, Defendant Director Capaldo arranged a meeting with Plaintiff. She started by offering a brief, insincere apology for "what had happened to [Plaintiff]" at Defendant Rebekah Rehab. The apology offered little consolation: by then, Plaintiff knew about the approximately 20 other complaints against Defendant Building Services Sin that Defendant Rebekah Rehab had not taken seriously. Plaintiff knew that if Defendant Rebekah Rehab had taken those other complaints seriously, she would not have been assaulted.

100.    Defendant Director Capaldo assured Plaintiff that "the issue had been resolved" because Defendant Director Capaldo gave Defendant Building Services Sin the option to resign rather than being fired. He chose resignation.

101.    Next, Defendant Director Capaldo sharply informed Plaintiff that she was aware that Plaintiff called the police, as if her doing so violated a company policy. Defendant Director Capaldo implied that Plaintiff made a mistake by involving the police, explaining that Plaintiff would likely be interrogated harshly by investigators.

102.    When Plaintiff told Defendant Director Capaldo that she intended to pursue the criminal complaint even though Defendant Building Services Sin was no longer a Defendant

21

Rebekah Rehab employee, Defendant Director Capaldo awkwardly responded, "Oh. I didn't know you were still going to go through with it," as if the sexual assault did not warrant further thought because "the issue was resolved."

103.    Despite previous deliberate inaction, Defendant Director Capaldo insisted that everything was taken care of and that Defendant Rebekah Rehab "does not condone that here."

104.    Upon information and belief, Defendant Director Capaldo feared that the police and the New York State Department of Health would discover that Defendant Rebekah Rehab covered up and failed to take appropriate action after receiving about 20 complaints of sexual harassment and assault concerning Defendant Building Services Sin.

105.    Upon information and belief, Defendant Rebekah Rehab chose to sweep 20-odd sexual assaults against employees under the rug for fear of what having a sexual predator on staff amidst a vulnerable patient population could mean for its own financial interests.

106.    Upon information and belief, Defendant Rebekah Rehab condoned sexual harassment and assault by failing to take action after receiving reports from about 20 female employees.

107.    As Plaintiff left the meeting, Defendant Director Capaldo shared that her door was always open if Plaintiff wanted to talk, and immediately took the statement back by stating, "Well, sometimes I am busy." Upon information and belief, Defendant Director Capaldo was referring to the countless times that she avoided and ignored Plaintiff's complaints of unpaid work and discriminatory employment practices at Defendant Rebekah Rehab.

108.    As a result of Defendant Rebekah Rehab's failure to take action or investigate reports of sexual harassment and assault, Plaintiff was forced to endure a traumatic event. She continues to suffer from post-traumatic stress disorder.

**Defendant Rebekah Rehab's Salon Is Shut Down Due To The Covid-19 Pandemic**

109.    In or about March 2020, Defendant Rebekah Rehab's salon was temporarily closed due to the Covid-19 pandemic and lock-down mandates. CEO Gelb offered Plaintiff a receptionist position at Defendant Rebekah Rehab at an hourly rate of $16.  Plaintiff accepted the position and immediately began training.

110.    Within a month, Defendant Director Capaldo called Plaintiff to let her know that she was no longer needed as a receptionist. As a result, Plaintiff became unemployed.

**Defendant Rebekah Rehab's Salon Reopens And Defendant
Director Capaldo Retaliates Against Plaintiff**

111.    In or about January 2021, the State of New York lifted certain COVID-19 restrictions and the salon was able to reopen. At first, Defendant Director Capaldo ignored Plaintiff's calls about setting a return-to-work date. Upon information and belief, Defendant Director Capaldo wished to terminate Plaintiff's employment in retaliation for making a complaining to the police about the sexual assault that occurred at Defendant Rebekah Rehab.

112.    When Plaintiff finally reached Defendant Director Capaldo, she insisted that Plaintiff undergo physical and other medical evaluations ordinarily required only of new employees. Upon information and belief, Defendant Director Capaldo did not require other employees to undergo a new set of physical and medical evaluations.

113.    Upon information and belief, Defendant Director Capaldo wanted to make it difficult for Plaintiff to return to work in hopes that she would decide to not to return to Defendant Rebekah Rehab.

114.    In or about January 2021, after Plaintiff completed the required examinations and testing, Plaintiff returned to work at Defendant Rebekah Rehab's salon. As a COVID-19 safety protocol, Plaintiff was required to undergo daily COVID testing.

23

115.    On her first day back, Defendant Director Capaldo that she was banned from going upstairs to transport clients to the salon. Defendant Director Capaldo told her the ban was to prevent the spread of COVID-19, but Plaintiff was already taking the same safety precautions as employees who were permitted on the patient floors. Upon information and belief, Defendant Director Capaldo banned Plaintiff from transporting residents to prevent Plaintiff from performing her job and to limit her income in retaliation for reporting the assault to the police.

116.    When Plaintiff entered the salon, Director Hera had already transported a handful of clients to the salon to receive cosmetology services. Plaintiff was hopeful that the new COVID-19 protocols would finally require Director Hera to provide Plaintiff with the transporters and the same treatment as the previous, white cosmetologist enjoyed.

117.    When Plaintiff was finished with the services, she learned that Director Hera had left for the day without designating any Activities Department employees to transport the residents back to their rooms. When residents began asking to be brought back to their rooms, Plaintiff panicked because she was banned from transporting them herself. Plaintiff called Defendant Director Capaldo to ask what she should do, but Defendant Director Capaldo did not answer.

118.    Plaintiff went to the security office for help. They expressed surprise that Defendant Director Capaldo had not answered Plaintiff's call because she was currently sitting in her office. Upon information and belief, Defendant Director Capaldo ignored Plaintiff in retaliation for reporting the assault to the police.

119.    When Plaintiff left to return to the residents who were alone in the salon, she ran into several nurses who leaving for the day. The nurses quickly noticed that Plaintiff was in severe distress and asked her what was wrong. When Plaintiff shared that she was not allowed to

go upstairs to bring the residents back to their rooms and was left without transporters, the nurses helped Plaintiff by bringing the patients to their rooms.

**Plaintiff Is Constructively Terminated From Defendant**
**Rebekah Rehab In Retaliation For Reporting Sexual Harassment To The Police**

120.    The next day, Plaintiff sat in the salon without a single client for the entire day due to Defendant Rebekah Rehab's failure to provide Plaintiff with transporters. Defendant Director Capaldo ignored Plaintiff's calls throughout the day. Plaintiff quickly realized that she was being forced out of Defendant Rebekah Rehab by Defendant Director Capaldo who had made it impossible for her to perform cosmetology services or make money.

121.    For the next several days, Plaintiff had no clients. Accordingly, she began packing up the salon. Defendant Director Capaldo continued ignoring Plaintiff's calls, even when she tried to return the keys to the salon.

122.    Defendant Director Capaldo forced Plaintiff to wait outside of her office for 30 minutes until she came outside. Plaintiff, with tears in her eyes, explained that she could no longer perform her job without clients, which required an assigned transporter or the ability to transport them herself. Thereafter, Defendant Director Capaldo took the key from Plaintiff and stated, "Take care, bye." Defendant Director Capaldo seemed relieved that Plaintiff would no longer be working at Defendant Rebekah Rehab.

123.    Upon information and belief, Defendant Director Capaldo constructively discharged Plaintiff by intentionally ignoring her needs and making it impossible for Plaintiff to earn any further pay.

## AS AND FOR PLAINTIFF'S FIRST CAUSE OF ACTION
(Race Discrimination in Violation of 42 U.S.C. § 1981 against All Defendants)

124.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

125.    Defendants have discriminated against Plaintiff in violation of 42 U.S.C. § 1981, by subjecting her to different treatment on the basis of her race. Plaintiff has suffered both disparate impact and disparate treatment as a result of Defendants' wrongful conduct.

126.    Defendants have discriminated against Plaintiff by treating her differently from and less preferably than similarly-situated white employee, and by subjecting her to disparate terms and conditions of employment, including constructive termination and a hostile work environment, and other forms of discrimination on the basis of her race in violation of 42 U.S.C. § 1981.

127.    The conduct of Defendants was intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

128.    By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of 42 U.S.C. § 1981.

129.    As a result of Defendants' violation of 42 U.S.C. § 1981, Plaintiff has been damaged in an amount to be determined at trial.

## AS AND FOR PLAINTIFF'S SECOND CAUSE OF ACTION
(Race and Gender Discrimination in Violation
of the New York State Human Rights Law against All Defendants)

130.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

131.     Defendants have discriminated against her and/or aided and abetted discrimination against her in violation of the New York State Human Rights Law (NYSHRL) by subjecting her to different treatment on the basis of her race and gender. Plaintiff has suffered both disparate impact and disparate treatment as a result of Defendants' wrongful conduct, including termination and a hostile work environment.

132.     Defendants' conduct was intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

133.     By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of the NYSHRL.

134.     As a result of Defendants' violation of the NYSHRL, Plaintiff has been damaged in an amount to be determined at trial.

<u>**AS AND FOR PLAINTIFF'S THIRD CAUSE OF ACTION**</u>
(Retaliation in Violation of the NYSHRL)

135.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

136.     Plaintiff was an employee of Defendants and is protected by the NYSHRL from retaliation and retaliatory discharge.

137.     Plaintiff complained to Defendants about the race and gender discrimination to which she was subjected during her employment with Defendants.

138.     Plaintiff's complaints were ignored and discouraged by Defendants.

139.     Defendants, unlawfully and without cause, retaliated against Plaintiff and/or aided and abetted retaliation against her as a direct result of Plaintiff's complaining about the incidents of race and national origin discrimination.

140.     Because she protested Defendants' unlawful behavior, Plaintiff was subjected to retaliation.

141.     The retaliation substantially interfered with the employment of Plaintiff and created an intimidating, offensive, and hostile work environment in violation of the NYSHRL and ultimately resulted in her constructive termination. Defendants knew and should have known about the retaliation and the affect it had on Plaintiff's employment and failed to take any action to stop the retaliatory conduct.

142.     As a direct and proximate result of said unlawful employment practices and disregard for Plaintiff's rights and sensibilities, Plaintiff has lost and will continue to lose substantial income including, but not limited to wages and other benefits due her.

143.     Additionally, Plaintiff has suffered the indignity of discrimination and retaliation, the invasion of her rights to be free from discrimination, great humiliation, and physical assault, which have manifested in serious emotional distress.

144.     As a further direct and proximate result of said unlawful employment practices and retaliation, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, post-traumatic stress disorder, and the loss of enjoyment of the ordinary pleasures of everyday life.

145.     As a result of Defendants' violation of the NYSHRL, Plaintiff has been damaged in an amount to be determined at trial.

## AS AND FOR PLAINTIFF'S FOURTH CAUSE OF ACTION

(Race and Gender Discrimination in Violation of the
New York City Human Rights Law against All Defendants)

146.     Plaintiff re-alleges and incorporates by reference each and every allegation in

each and every aforementioned paragraph as if fully set forth herein.

147.     Defendants have discriminated against her and/or aided and abetted

discrimination against her in violation of the New York City Human Rights Law (NYCHRL) by

subjecting her to different treatment on the basis of her race and gender. Plaintiff has suffered

both disparate impact and disparate treatment as a result of Defendants' wrongful conduct,

including termination and a hostile work environment.

148.     Defendants have discriminated against Plaintiff by treating her differently from

and less preferably than similarly-situated white and male employees and by subjecting her to

disparate terms and conditions of employment, and other forms of discrimination on the basis of

her race and gender, in violation of the NYCHRL.

149.     Defendants' conduct was intentional, deliberate, willful, malicious, reckless, and

conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

150.     By reason of Defendants' discrimination, Plaintiff is entitled to all remedies

available for violations of the NYCHRL.

151.     As a result of Defendants' violation of the NYCHRL, Plaintiff has been damaged

in an amount to be determined at trial.

## AS AND FOR PLAINTIFF'S FIFTH CAUSE OF ACTION

(Retaliation in Violation of the NYCHRL against All Defendants)

152.     Plaintiff re-alleges and incorporates by reference each and every allegation in

each and every aforementioned paragraph as if fully set forth herein.

153.    Plaintiff was an employee of Defendants and is protected by the NYCHRL from retaliation and retaliatory discharge.

154.    Plaintiff complained to Defendants about the gender discrimination and sexual assault to which she was subjected during her employment with Defendants.

155.    Plaintiff's complaints were ignored and discouraged by Defendants.

156.    Defendants, unlawfully and without cause, retaliated and/or aided and abetted retaliation against Plaintiff as a direct result of Plaintiff's complaining about the incidents of gender discrimination and sexual assault.

157.    Because she protested Defendants' unlawful behavior, Plaintiff was subjected to retaliation.

158.    The retaliation substantially interfered with the employment of Plaintiff and created an intimidating, offensive, and hostile work environment and ultimately Plaintiff's constructive termination in violation of the NYCHRL.

159.    Defendants knew and should have known about the retaliation and the affect it had on Plaintiff's employment and failed to take any action to stop the retaliatory conduct

160.    As a direct and proximate result of said unlawful employment practices and disregard for Plaintiff's rights and sensibilities, Plaintiff has lost and will continue to lose substantial income including, but not limited to wages and other benefits due her.

161.    Additionally, Plaintiff has suffered the indignity of discrimination and retaliation, the invasion of her rights to be free from discrimination and great humiliation, which has manifested in serious emotional distress including post-traumatic stress disorder.

162.    As a further direct and proximate result of said unlawful employment practices and retaliation, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her

future and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

163.    As a result of Defendants' violation of the NYCHRL, Plaintiff has been damaged in an amount to be determined at trial.

### AS AND FOR PLAINTIFF'S SIXTH CAUSE OF ACTION
(Unequal Pay in Violation of the New York Equal Pay Act against All Defendants)

164.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

165.    Defendants violated the right of Plaintiff to be paid the same as male and white employees performing equal or substantially similar work in violation of the New York Labor Law § 194.

166.    Defendants were aware of their unfair pay practices, but did not rectify or investigate those unlawful pay practices.

167.    Defendants' violations of New York Equal Pay laws were therefore willful, entitling plaintiff to lost wages, statutory liquidated damages, and punitive damages.

### JURY DEMAND

168.    Plaintiff demands a trial by jury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants for all compensatory damages, mental pain and suffering damages, statutory liquidated damages, and punitive damages, as well as the costs and disbursements of this action, including reasonable attorneys'

31

fees incurred in pursuing these claims, together with such other and further relief as this court

deems equitable, proper, and just.

Dated: New York, NY
      January 6, 2023

GODDARD LAW PLLC

By:   /s/ Megan S. Goddard
      Megan S. Goddard, Esq.
      39 Broadway, Suite 1540
      New York, New York 10006
      (646) 964-1178
      megan@goddardlawnyc.com

*Attorneys for Althea Beazer*